STATE of Missouri, Respondent,

v.

James F. McCONNELL, Appellant.

No. KCD 26635.

Missouri Court of Appeals, Kansas City District.

March 4, 1974.

C. B. Fitzgerald, Warrensburg, for appellant.

John C. Danforth, Atty. Gen., Neil MacFarlane, Asst. Atty. Gen., Jefferson City, for respondent.

.PRITCHARD, Presiding Judge.

Upon an amended indictment of a grand jury which alleged a previous conviction appellant was convicted by the verdict of a jury of burglary in the second degree and stealing in conjunction with burglary. Upon a finding of the applicability of the second offender act, the court sentenced appellant to imprisonment in the Department of Corrections for 10 years on the burglary charge and 5 years on the stealing in conjunction with burglary charge. The sentences were ordered to run concurrently.

In a timely filed motion for new trial, appellant made three assignments of error: "1. The Court erred in refusing to grant defendants motion for judgment of acquittal at the close of the States case for the reason that the States evidence constituted entrapment of this defendant as a matter of law. 2. That the State failed to prove venue. 3. That instruction No. 4 was erraneous in that same did not contain the words 'unless you believe that defendant is entitled to acquittal be reason of instruction No. 6' or words to that effect." Only two of the assignments of error (1. and 3.) are presented for review in appellant's brief (Points II and IV, but the latter point includes the allegation of error that also Instruction No. 5 failed to negate the defense of entrapment as set forth in Instruction No. 6).

Some two months after the time, as extended, for the filing of the motion for new trial appellant filed, by leave of court, an amended motion to set aside the verdict or for new trial, raising additional matters. It is not requested that the additional matters be considered under Rule 27.20(c), V. A.M.R., as plain error affecting the substantial rights of appellant, or to correct manifest injustice or miscarriage of justice. Errors assigned in the amended motion for new trial filed beyond the time permitted by law preserve nothing for review. State v. Tucker, 451 S.W.2d 91, 92[1–3] (Mo.1970); State v. Warren, 469 S.W.2d 662, 663[3–5] (Mo.App.1971). The additional matters presented in the amended motion will not be considered.

On the evening of March 28, 1970, Audie Lee Street and Dean Wilson met with appellant at the 95 Hundred Club in Kansas City, Missouri, where appellant worked. Street and Wilson were there to see appellant about participating in a burglary, and they stayed until about 1:00 a.m. when the club closed. They left and went to pick up Clara Rae Applegate, who worked at another club nearby. There was a discussion about burglarizing several stores, and the Safeway store in Clinton, Missouri, was primarily mentioned by the three men. The four left in two cars for Clinton and stopped about a mile outside the city, and then proceeded in appellant's car to the Safeway store. Wilson knew the combination of the safe in the store, and he and appellant, with tools went to it. Entrance through the roof was discussed. Street and Clara Rae drove around and eventually picked up the other two who had money orders. The total loot amounted to about $3,000.00. Street procured some money orders from Wilson on the pretext of selling them in Kansas City, and turned them over to Vic Canterbury, an FBI agent.

Street had been approached by Canterbury and Sheriff Schmidt of Clinton prior to the burglary who propositioned him to talk with appellant "and see if I could go with him on some robbery or something, to

catch him in a building or catch him in a store, and several other people there in Clinton, that they had wanted me to help them with." Street had met with Sheriff Schmidt and Canterbury, separately and together, 12 to 20 times in regard to inveigling appellant to commit a crime, and then to let them know when it occurred so they could catch him. Street eventually agreed, and talked with the two about six weeks prior to the "Safeway affair."

The actual conversations which Street had with appellant were developed on cross-examination. Street talked to him several times in Kansas City and in Nevada, "trying to get to go with him on a job." Q You never were successful, were you, up until the Safeway thing? A No. Q All right. In other words, you tried to get him to agree to take you somewhere or do something with you, and he would never do it; isn't that correct? A Yeah, I would say that's correct; right." Canterbury asked Street to work with him which is the reason Street went to Kansas City for a meeting with appellant. That meeting was not prearranged. Street talked with Wilson and told him he needed some money and that he wanted to go with them. Wilson said he also was needing some money and they would go up that night, "and get hold of Jim; that he had some places that would be pretty good or work out all right." "Q What I'm driving at—As a matter of fact, it's true, isn't it, that you went up there and approached him, with Dean Wilson, about doing this particular job; isn't that right? A I went up with Dean to approach him about doing a job, a particular job—any particular job. Q Isn't it a fact that you told him you had to have some money, and begged him to go along with you? A Yeah. Q That was done because of the conversations that you had had with Mr. Schmidt, and with the—Mr. Canterbury; isn't that right? A Yes, that's correct. Q All right. You were doing what you had agreed to do; isn't that right? A Right. Q I want to ask you, Mr. Street, if it isn't a fact that if you hadn't gone up there and asked Mr. McConnell, not on one occasion, but on several, and particularly on this Safeway matter, that he wouldn't have gone if it hadn't been for you; isn't that a fact? A I don't know. I don't know. Q Well, you talked him into it, didn't you? A I told him that I needed some money and wanted to go with him on a job. Q And you went along with Dean Wilson, and you and Dean said 'we have got a combination now, let's go do it.'? A Yes. Q He didn't say, 'let's go do it,' did he? A That's correct; right. Q All right, sir. In other words, you are the ones; you and Mr. Wilson are the ones who arranged to have him do this thing, aren't you? A Yes; that's correct. Q He didn't volunteer and say, 'let's go rob someplace,' did he? A No, he didn't."

All that appears from the foregoing facts is *mere solicitation*. There is no evidence of reluctance or unreadiness on appellant's part to accept the solicitation. Other than the fact that Street needed money, and begged appellant to let him go along on a job, there is no evidence of repeated enticements. When it was known that Wilson had the combination to the safe in the Safeway store, appellant responded promptly and without reluctance. State v. Weinzerl, 495 S.W.2d 137, 143 (Mo.App.1973) controls. There was not only no entrapment as a matter of law, but "The submission of the entrapment issue by instruction to the jury was a benefit to which defendant was not entitled and a burden which the state should not have borne." And although MAI–CR Nos. 3.28 and 2.04 require the inclusion of a paragraph in the verdict directing instruction, as a part of the state's case, "that the defendant was not unlawfully entrapped as submitted," there is no evidence here of unlawful entrapment as would require a reference to that " 'special negative defense.' " Both points are ruled against appellant.

The judgment is affirmed.

All concur.